THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WAYNE FLOWERS, Defendant-Appellant.

First District (5th Division)   No. 76-269

Opinion filed August 26, 1977.

432

James Geis and Rebecca Davidson, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Myra J. Brown, and Richard J. Barr, Jr., Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Defendants, Wayne Flowers and Jerry Devine, were indicted for the murder of Willis Brown. (Ill. Rev. Stat. 1973, ch. 38, pars. 9—1 and 9—1(a-2).) They were found guilty by a jury and both were sentenced by the court to 60 to 150 years imprisonment. Defendant Flowers alone appeals his conviction and contends: (1) he was denied a trial before a fair and impartial jury; and (2) the sentence imposed was both arbitrary and excessive.

We affirm. The following testimony was adduced at trial.

Victor Robinson testified that on the evening of March 19, 1975, he attended a wake at the Biggs & Biggs Funeral Home located at Roosevelt and Laflin Streets, arriving at about 8:10 p.m. He remained outside talking with the victim, his wife, Willie Marvel Brown, and Patricia Hall for 20 to 25 minutes. These four then entered the funeral home, where Robinson noticed defendants, whom he identified in court. Robinson stated that he had attended grade school with Flowers and regularly saw Devine in the neighborhood.

Robinson, the Browns, and defendants exited the funeral home at the

same time. Defendants were accompanied by a "real close" friend known to Robinson as "Booney." After remaining in front of the funeral home for 15 to 20 minutes, the victim told his wife to return home, whereupon he and Robinson walked to 14th and Ashland Streets where they remained for about 35 to 40 minutes. They then walked a block and a half to the Spotsville Tavern located at Roosevelt and Loomis.

The victim demonstrated karate moves to some friends outside the tavern and accidentally hit Flowers. An argument ensued which required Robinson and Booney to restrain the victim. Flowers then approached Mrs. Brown, the victim's wife, who had just arrived at the tavern on a bicycle, accompanied by a young girl, and grabbed her, ripping her coat sleeve in the process. The victim then threw both defendants to the ground, after which he was again restrained by Robinson.

After the altercation defendants drove off in a car parked in front of the tavern, and Robinson retrieved Mrs. Brown's bicycle. Robinson next saw the Browns as they were walking home. At this time a car which Robinson had earlier observed parked in front of the tavern drove past him and turned around. Robinson testified that the car was driven by Flowers, with Devine occupying the front passenger's seat.

Robinson further testified that he continued walking, then looked around, and saw two flashes emanate from the driver's side of Flowers' automobile, after which the victim stumbled and fell. Robinson then started to run home, at which time he heard three or four more shots and the car speed away.

On cross-examination Robinson testified that the shooting took place sometime after 11 p.m. on Washburne Street. He stated that this area was well lit at the time of shooting by street lights, and that it was "as bright as this courtroom."

Willie Marvel Brown, the victim's wife, testified that she and her husband attended a wake on the night of March 19 along with Patricia Hall and Victor Robinson. She saw defendants at the wake. Upon leaving the funeral home, Mrs. Brown went home with Patricia Hall, while her husband proceeded to 14th Street with Robinson.

Mrs. Brown remained at home for approximately 15 minutes, until she was informed that her husband "wanted" her. She proceeded to 14th Street but found no one there, and decided to go to the Spotsville Tavern. En route to the tavern she passed her apartment building and met an 11-year-old girl she knew named Angel, and they proceeded together to the tavern on bicycles.

Upon arrival at the tavern, Mrs. Brown observed her husband being held by a man named Booney, and a crowd of people gathered around them. Flowers then approached Mrs. Brown and grabbed her coat, tearing its sleeve. Mrs. Brown identified People's exhibit no. 6 as the coat

torn by Flowers. The victim then grabbed both defendants and threw them to the ground, after which he was again restrained. Mrs. Brown testified that as the fracas subsided she and her husband began walking home, while Robinson retrieved the bicycle she had been riding.

As they proceeded down Washburne Avenue a car which Mrs. Brown had seen in front of the tavern drove past and turned around. Mrs. Brown testified that Flowers was driving the car and Devine was seated in the front passenger's seat. Defendants drove their car between the Browns, so that Mrs. Brown was on the passenger's side while her husband was on the driver's side. Mrs. Brown further testified that Flowers then leaned out the window and fired two shots at her husband, after which he fell to the ground. Both defendants then exited their car and, while standing over the victim, took turns shooting him. Mrs. Brown ran to her father's house and called the police.

On cross-examination Mrs. Brown stated that defendants fired a total of six shots into her husband.

Juanetta Crittenden, nicknamed Angel, testified that she had accompanied Mrs. Brown to the tavern on the night of March 19, and substantially reiterated Mrs. Brown's account of the altercation that occurred at the tavern between defendants and the victim. She started to ride her bicycle back home from the tavern after the incident and a car drove past her. Juanetta turned and saw the car drive between the Browns, with the victim on the driver's side of the car.

Juanetta next testified that she observed two shots fired from the car, and then both occupants exited the car and, while standing over the fallen victim, shot him again. She identified defendants as the men who did the shooting.

On cross-examination, Juanetta stated that she heard six shots fired by defendants. She further stated that the area of the shooting was illuminated by seven street lights, and added that she was 13 to 25 feet in front of the Browns when the shooting occurred.

Dr. Pascul Culala, a pathologist with the Cook County Coroner's Office, conducted an autopsy of the deceased. The examination revealed that deceased had been shot in three locations; the first wound was three inches above the left ear, the second wound was located above the junction of the neck and chest, and the third wound was located in the abdomen. Dr. Culala testified that he discovered powder burns radiating from wound number two at the base of deceased's neck. He stated that this particular wound was inflicted by a gun held no more than six inches from the target area. In Dr. Culala's opinion, death was precipitated by the bullet wound to the head causing laceration of the brain.

James Rogers testified for defendants that on the night of the shooting defendants arrived at his house for a dog club meeting at approximately 6

p.m. Besides the witness and defendants, there were approximately nine other club members, including George Davis who was the last member to arrive at about 9 p.m. Rogers stated that no one left the meeting until 1 a.m. the next morning, at which time both defendants left. George Davis did not leave until 3 a.m.

George Davis, also known as Booney, testified that on the evening of March 19 he observed the victim fighting with various individuals in front of the Spotsville Tavern. Davis grabbed the victim and carried him across the street where the victim began arguing with his wife. Davis then stated that the victim grabbed his wife by the arm and ripped the sleeve of her jacket.

Davis testified that a friend drove the victim home, but the latter exited the car and proceeded back toward the tavern. As the victim approached Loomis and Washburne Streets, Davis saw another car pull up, at which time he heard shots fired and saw the victim fall. He stated that he ran toward the scene, but it was too dark to see and identify the killers. After the shooting Davis went to Rogers' house to attend a dog club meeting, arriving there at approximately 1 a.m. Defendants were present at the meeting when he arrived.

Ronald Early testified that on March 19 defendants picked him up between 5:30 and 6 p.m. in a car driven by Flowers. The three of them drove to Rogers' house, which they did not leave until approximately 2 a.m.

Both defendants testified in their own behalf. Each stated that on the evening of March 19 they attended a meeting at Rogers' house. Devine stated that they arrived at the meeting between 5:30 and 7 p.m., and Flowers estimated their arrival at between 6 and 6:45 p.m. Devine testified that they did not leave Rogers' house until between 1:30 and 3 a.m., and Flowers stated that they left somewhere between 2 and 2:30 a.m. Flowers also testified that Davis joined the meeting at approximately 10 or 11 p.m.

Defendant initially contends that he was denied a trial before a fair and impartial jury. Specifically, defendant contends that the court erred in not inquiring into the potentially prejudicial taint of the jury caused by the unusual behavior of three separate jurors. We find no merit in this contention.

Prior to commencement of trial, two jurors, Ronald Jacobson and Frances Denman, sought to communicate with the court. Juror Jacobson sent a note to the judge by way of a court bailiff which read:

"Sir:

If per chance I was picked foreman at the end of [the] case and their [sic] is a draw decision is it my duty to talk and sway decisions for a final decision.

· Ronald W. Jacobson"

At the same time, the other court bailiff indicated to the court that juror Denman had requested that she be excused from jury service due to an "uneasy feeling."

Defense counsel asked to have the entire jury examined individually to determine if any jurors had been tainted by conversations with Mr. Jacobson or Ms. Denman. The court refused this request, indicating that it would inform the jury that it would be instructed as to the law at the end of the case.

In response to juror Jacobson's query, the trial judge directed the bailiff to indicate to the juror that the court had no answer for his question. The judge then decided to have juror Denman brought to his chambers where the court and counsel for both sides could question her. Although defense counsel objected to the solitary interrogation, Ms. Denman was brought in and questioned.

In chambers, Ms. Denman informed the court that she had been unable to sleep the previous night and that she could not be impartial at the present time. During her voir dire she had expressed some hesitation about sitting on a murder trial. She had stated that she would have reservations in reaching a verdict, but would "try to think things out clearly." During the in-chambers questioning, however, she informed the court that she could not vote defendant guilty no matter what the evidence showed; even if the State proved guilt beyond a reasonable doubt, she could not sign a guilty verdict. Defense counsel inquired if she had spoken to her fellow jurors; however, the State objected and the court instructed her not to answer. Upon the State's motion, Ms. Denman was then excused and the first alternate substituted.

■■ Defendant argues that the court should have interrogated the entire jury for possible taint arising from their contact with jurors Jacobson and Denman. It was, however, within the sound discretion of the trial court to decide whether to re-voir-dire the jury. It is only the improper abuse of that discretion by the trial court that is error, not the refusal to interrogate the jury. (*People v. Heller* (1971), 131 Ill. App. 2d 799, 267 N.E.2d 685.) We find no such abuse of discretion in the instant case.

At the time jurors Jacobson and Denman communicated with the court no evidence or arguments had been heard by the jury concerning the instant case. Further, there is no indication that this case generated public exposure. Under such circumstances we believe that the court correctly responded to the inquiries of the two jurors. We can find no prejudice to defendant in the court's actions.

■■ Juror Jacobson, for some unknown reason, wished to know the role of a foreman when the jury is deadlocked on a verdict. The court's

refusal to answer Jacobson's question was proper since an applicable instruction would be issued when all the evidence had been heard.

■■ Defendant speculates that Jacobson's concern indicates that the jurors had already selected a foreman, especially since Jacobson did eventually become the foreman. Certainly, a myriad of reasons could underlie Jacobson's query. Assuming *arguendo*, however, that defendant's speculation is correct and Jacobson had been tentatively selected foreman, we can find no prejudice to defendant. No evidence had been heard in the case and the jurors' prior vows of impartiality would still be intact and unaffected by Jacobson's selection. We believe that the trial court correctly determined that this inquiry required no further examination of either Jacobson or the other jurors. Thus, the court did not abuse its discretion in this regard.

■■ As to juror Denman, the court properly determined that her request required further examination of her. It became apparent after questioning that Ms. Denman had failed to overcome the apprehensions she had expressed in her earlier voir dire examination. She stated that even if the State proved defendant guilty beyond a reasonable doubt, she would not sign a guilty verdict. Therefore, it was proper for the court to excuse her, for when a juror evidences bias or prejudice towards either party, disqualification is warranted on the basis of her inability to be impartial. *People v. Hobbs* (1966), 35 Ill. 2d 263, 220 N.E.2d 469, *cert. denied* (1967), 386 U.S. 1024, 18 L. Ed. 2d 463, 87 S. Ct. 1381.

■■ In addition, the court did not abuse its discretion in refusing to interrogate the remaining jurors concerning their contacts with Ms. Denman, nor did it err in not allowing defense counsel to question her as to whether she had related her "uneasiness" to the other jurors. Such inquiries would have been meaningless since the jury knew nothing about the case at that moment other than it was a murder case. The remaining jurors were familiar with Ms. Denman's apprehensions concerning a murder conviction from the prior voir dire, and even if she later conveyed her feelings that she definitely could not vote guilty no matter what the evidence showed, we fail to see how such divulgence would prejudice defendant. The court had no reason to believe that the impartiality of the remaining jurors toward defendant had been, or could be, adversely affected by her attitude. Under such circumstances, the limitations imposed by the court upon the re-voir-dire of Ms. Denman were reasonable and well within the exercise of sound judicial discretion. See *People v. Parisie* (1972), 5 Ill. App. 3d 1009, 287 N.E.2d 310.

■■ Defendant next argues that he was improperly denied the opportunity to explore the nature of the problem which confronted a third juror in the case, Myron Keel. Prior to commencing the third day of trial he expressed a desire to speak to the trial judge. He was brought into

chambers and stated that he had a problem and that he thought "one of the attorneys knows what the problem is." In response to questioning by the court Keel stated that what he had learned had no bearing on the case and would not affect his decision. He indicated that he could remain fair and impartial and that, whatever he had learned, he would keep it to himself. He was then returned to jury service. Defense counsel and both State's Attorneys denied any knowledge as to what was troubling juror Keel.

Our review of the record in the instant case reveals that defense counsel did not urge a course of action or questioning on the court which would expose Keel's alleged problem. Neither did defense counsel request to interrogate the juror concerning the problem. In fact, defendant's attorney was given the opportunity to question him but declined to do so. Under such circumstances we believe defendant is estopped on appeal from arguing as error that the court precluded exposure of Keel's problem. *People v. Pisarski* (1972), 6 Ill. App. 3d 235, 285 N.E.2d 551; *People v. Nelson* (1967), 87 Ill. App. 2d 159, 231 N.E.2d 115, *aff'd in part and rev'd in part*, 41 Ill. 2d 364, 243 N.E.2d 225 (1969).

■■ Regardless of defendant's failure to preserve the instant issue, his contention in this regard is without merit. At no time was there any indication that the unknown problem would have any effect on juror Keel's determination of the case. The trial court's inquiry was aimed specifically at the effect Keel's discovery would have on his vow of impartiality. He had undergone extensive voir dire earlier and been accepted as a juror, and once he assured the court in chambers that he would remain impartial, render a verdict based on the evidence, and would keep to himself whatever he had discovered, there was no need to further question him. The court did go further, however, and established that none of the attorneys knew his problem, despite Keel's belief to the contrary. We believe that the actions of the court in this matter constitute a proper exercise of judicial discretion, especially in light of defendant's failure to urge a different course of action upon the court. (*Cf. People v. Carbona* (1975), 27 Ill. App. 3d 988, 327 N.E.2d 546, *cert. denied* (1976), 424 U.S. 914, 47 L. Ed. 2d 319, 96 S. Ct. 1114; *People v. Pisarski.*) All that is required is that a juror render his decision based on the evidence presented and ignore any extraneous influences. (*Irvin v. Dowd* (1961), 366 U.S. 717, 6 L. Ed. 2d 751, 81 S. Ct. 1639.) In the instant case the trial court had an adequate basis for believing that Keel's conduct would comport with such a standard.

■■ Defendant also alleges that he was prejudiced by not being present during any of the sidebar conferences concerning juror irregularity. In response, we note that defendant has waived this issue by failing to include it in his written motion for a new trial. (*People v. Pickett*

(1973), 54 Ill. 2d 280, 296 N.E.2d 856; *People v. Irwin* (1965), 32 Ill. 2d 441, 207 N.E.2d 76.) We find no reason for departing from the strict application of the general waiver rule in the instant case. The evidence of defendant's guilt was not closely balanced. Defendant's alibi witnesses and testimony were contradictory and impeached one another, while three eyewitnesses testified to substantially the same facts and positively identified defendant as the perpetrator of the crime.

■■ In addition, we note that defendant's presence in the circumstances of this case would have been useless. When jurors Jacobson and Denman communicated with the court no evidence had yet been heard, and when juror Keel indicated that one of the attorneys knew his problem the court determined that none of the attorneys knew either Keel or his problem. The fourteenth amendment to the United States Constitution does not assure the privilege of presence when that presence would be useless. (*Snyder v. Commonwealth of Massachusetts* (1934), 291 U.S. 97, 78 L. Ed. 674, 54 S. Ct. 330.) Similarly, we can hardly say that defendant's presence at these conferences under such circumstances involved such substantial rights as to be protected under the Illinois Constitution. (See Ill. Const. 1970, art. I, §8; *People v. Woods* (1963), 27 Ill. 2d 393, 189 N.E.2d 293; *People v. Holmes* (1974), 17 Ill. App. 3d 102, 307 N.E.2d 776.) Thus, we can find no prejudice or injustice to defendant of a nature to cause this court to invoke the plain error rule (Ill. Rev. Stat. 1975, ch. 110A, par. 615(a)), which acts as a means of ameliorating the harshness of the general waiver rule (*People v. Pickett*).

Defendant's second contention is that the sentence imposed was both arbitrary and excessive. After hearing evidence in mitigation and aggravation, including consideration of the presentence report, the court sentenced defendant to a term of 60 to 150 years, noting that deceased had a life expectancy of 50 to 60 years at the time he was murdered. Specifically, the court stated:

> "I have examined the pre-sentence investigations, and though I feel that the defendants have no really serious criminal backgrounds, the finding of the jury, finding the defendants guilty, was in fact a proper finding. It only remains—and I concur with the jurors in their decision in finding the defendants guilty—however this was a very serious crime. It took away the life of a young person, as the jury found, who had a life expectancy of maybe over 50 years, maybe 60. So, they took away 60 years, so I am going to give them 60 years at the bottom, and 150 at the top, as to each, both of the defendants."

■ ■ ■ Based on this statement by the court, defendant asserts that the sentence imposed was impermissibly and arbitrarily based on the life

expectancy of the deceased. We disagree. The trial court's determination of the minimum portion of defendant's sentence was not arrived at by speculation and whimsey, but rather was devised as a response to the need to set a proper punishment reflecting the crime committed. The mere fact that the court may have used the deceased's projected life expectancy as a measuring rod for the establishment of the minimum portion of defendant's sentence does not indicate that the court abused its discretion in imposing sentence. The record clearly reflects that the court was aware of, and considered, the mitigating factors concerning defendant, especially his lack of a serious criminal record. Therefore, it cannot be said that the court's imposition of sentence was not well considered. *Cf. People v. Wilson* (1963), 29 Ill. 2d 82, 193 N.E.2d 449.

Defendant also contends that the sentence imposed was excessive since the instant offense constituted his only conviction for a crime of violence. Defendant was 24 years old at the time of sentencing, and his only previous convictions were for being a patron in a disorderly house in 1971, and possession of a hypodermic needle in 1974. In light of this criminal record, defendant asserts that there is no basis for imposition of a minimum sentence greater than the statutory minimum of 14 years. We disagree.

Murder is a separate class felony for which a penitentiary sentence for an indeterminate term of not less than 14 years is provided. (Ill. Rev. Stat. 1973, ch. 38, par. 9—1(b).) The Unified Code of Corrections provides that the maximum term for murder shall be any term in excess of 14 years (Ill. Rev. Stat. 1973, ch. 38, par. 1005—8—1(b)(1)), and the minimum term shall be 14 years unless the court, having regard to the nature and circumstances of the offense and the history and character of the defendant, sets a higher minimum term. (Ill. Rev. Stat. 1973, ch. 38, par. 1005—8—1(c)(1).) The sentence here is within the limits set by the Code, and the record reflects that the trial judge did consider both defendant's prior criminal record and the nature of the offense in imposing sentence.

■■ Despite defendant's lack of a serious criminal record, the evidence adduced in the instant case establishes that deceased was murdered in a brutal and cold-blooded manner. Defendant purposely pursued deceased and shot him while he was standing next to the vehicle which defendant was driving. Defendant then exited his car and, while standing over the felled and helpless victim, took turns shooting him with his co-defendant. These actions are an adequate basis for imposition of a sentence higher than the statutory minimum. *Cf. People v. Caldwell* (1968), 39 Ill. 2d 346, 236 N.E.2d 706.

■■ Defendant also claims that the sentence imposed by the court

does not take into account "the objective of restoring the offender to useful citizenship." (Ill. Const. 1970, art. I, §11.) Defendant asserts that a minimum term of 60 years will deprive him of the opportunity to rehabilitate himself and to be integrated into the community as a useful citizen. This contention is without merit. We have already determined that the nature of the offense dictates a minimum term in excess of 14 years. In addition, we note that irrespective of his 60-year minimum sentence, defendant will be eligible for parole consideration after serving 11 years and 3 months. (Ill. Rev. Stat. 1973, ch. 38, par. 1003—3—3(a)(1), and Ill. Dep't of Corrections, Adult Division, Adm. Reg. No. 813 (April 16, 1976).) Thus, defendant would be eligible for integration into useful citizenship at age 35. In light of these provisions and the nature of the crime, we find no merit to defendant's contention that his prospects for rehabilitation require a minimum term of less than 60 years to be set.

Finally, both as to defendant's minimum term and as to his entire sentence of 60 to 150 years, we note that the power of the reviewing courts to reduce sentences (Ill. Rev. Stat. 1973, ch. 110A, par. 615(b)(4)) should be applied with considerable caution and circumspection since the trial judge ordinarily has a superior opportunity in the course of the trial and the hearing in aggravation and mitigation to make a sound determination as to the punishment to be imposed. (*People v. Fox* (1971), 48 Ill. 2d 239, 269 N.E.2d 720; *People v. Stephens* (1974), 18 Ill. App. 3d 971, 310 N.E.2d 824.) The power is limited in use to those instances where the punishment imposed is at variance with the fundamental spirit of our laws, or is disproportionate to the offense. (*People v. Smith* (1958), 14 Ill. 2d 95, 150 N.E.2d 815; *People v. Huggy* (1974), 19 Ill. App. 3d 247, 311 N.E.2d 355.) Absent a clear showing of abuse of discretion, the sentence imposed by the trial court will not be disturbed on review. (*People v. Burbank* (1972), 53 Ill. 2d 261, 291 N.E.2d 161, *cert. denied* (1973), 412 U.S. 951, 37 L. Ed. 2d 1004, 93 S. Ct. 3017; *People v. Hanserd* (1970), 125 Ill. App. 2d 465, 261 N.E.2d 317.) In the instant case, in view of the brutal manner in which the crime was perpetrated, we cannot say that the trial court abused its discretion in its determination of sentence. We therefore conclude that this is not a proper case in which to exercise our power to reduce sentence.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

SULLIVAN, P. J., and LORENZ, J., concur.