THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* EVERETT BOWEN, Defendant-Appellant.

First District (5th Division)   No. 78-1159

Opinion filed July 25, 1980.

James J. Doherty, Public Defender, of Chicago (Marc Fogelberg, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and Joan S. Cherry, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

After a jury trial, defendant was convicted of murder (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(a)(2)) and arson (Ill. Rev. Stat. 1977, ch. 38, par. 20—1) and sentenced to serve a term of 100 to 150 years. On appeal, defendant presents these arguments: (1) his confession was involuntary; (2) the trial court erred in refusing his involuntary manslaughter instructions; (3) the trial court erred in precluding testimony of his expert witness; (4) the trial court abused its discretion in refusing to read a list of witnesses to the first panel of jurors; and (5) the case should be remanded in light of the recent Supreme Court decision in *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248. We affirm the trial court.

## I. MOTION TO SUPPRESS DEFENDANT'S PRE-TRIAL STATEMENTS

A fire occurred on July 2, 1977, at 4:30 a.m. at the home of Mr. and Mrs. William Booth. Mrs. Evelyn Bowen, defendant's spouse, and her four children were living in the Booth household at the time. Three of the children perished in the fire. Mrs. Bowen and another son escaped. The Booth family was away in Wisconsin.

Defendant was spotted at the scene of the fire at 8:15 a.m. He asked where the children were and was told that his children had died in the fire. He responded, "You're kidding me." Northlake Police Officer Thomas O'Cull asked defendant to go down to the Northlake police station to speak with detectives there but he was not told he was under arrest, nor was he handcuffed or searched. He agreed to go and was transported to

the station in a squad car. Sergeant Gilliam gave him *Miranda* warnings. Defendant stated that he understood his rights and signed a waiver of rights form. When asked about his activities of the previous evening, he stated that he went to his brother-in-law's house to talk with his wife concerning insurance matters but did not go into the house. He kicked in the front door of the house, left, and went back to his house. After leaving his house, he spent the evening drinking at a tavern until 3 a.m. and then returned home.

Assistant State's Attorney Patrick O'Brien arrived at the station to talk with defendant and again advised him of his rights. Defendant indicated he understood, and denied starting the fire. He volunteered to take a polygraph test, but there was no technician on duty to administer the test. He was then taken to Cook County morgue to make a positive identification of the children, whereupon he broke down and cried for a short period when the last of his children had been identified.

After obtaining defendant's consent to search his apartment, Detective Peters and Mr. O'Brien talked with his upstairs neighbor, Cynthia Duda Benson, and she told them that she heard his van leave early in the morning of July 2, 1977. When O'Brien returned to the station, defendant was speaking with his minister. After the minister left, he was again questioned but denied moving his van on the morning in question.

O'Brien determined there was insufficient evidence to hold defendant but he was asked to return to the station the next morning to take the polygraph test. The following morning defendant accompanied Sergeant Gilliam and Detective Peters to Joliet for the test. He was not questioned on the way to Joliet. Prior to the test, he was asked by technician Dennis Luporini if he understood his *Miranda* rights, whereupon he indicated that he had previously taken a polygraph test in connection with his employment. Technician Luporini analyzed the results of the test and determined defendant had not told the truth in regard to the fire investigation. Subsequently, he was confronted with the results of the test but denied that he had lied. Detective Peters questioned him on the return trip from Joliet. Neither Sergeant Gilliam nor Detective Peters yelled at, accused, or threatened him.

Chief Lee Gehrke requested to speak with defendant. He asked him whether he had returned to the station voluntarily and defendant indicated that he had. Gehrke informed defendant that his rights were still in effect and that he could leave the station any time. He indicated that he understood. Chief Gehrke went over defendant's version of what had transpired the evening of July 1, 1977, and the early morning of July 2, 1977. Defendant twice denied setting the fire. Gehrke then said to him, "Everett, if you had anything to do with that fire now is the time to make peace with yourself, your God, and your children." Gehrke stated that

defendant started to cry and said, "I can't stand it any longer. I started the fire." Defendant indicated that when he left the tavern in Northlake he walked to the Booth house, went to the side window, took out a cigarette lighter and lighted the curtains or drapes. He closed the window, walked back to his van and returned home, remaining there until he received a telephone call from a friend telling him about the fire.

Chief Gehrke learned from defendant that the cigarette lighter he had been using to light his cigarettes was the one used to start the fire. Gehrke confiscated the lighter as evidence and told Detective Peters to notify the State's Attorney's office.

Defendant spoke with his minister after his statement was taken. Up until the time his statement was made he was not under arrest and no charges had been placed against him.

Assistant State's Attorney Mark Tobias took defendant's written statement, again advising him of his rights. After the statement was transcribed, Tobias read the contents of the statement to him. Defendant initialed each page of the statement.

The next morning defendant requested to be taken to the Northlake Funeral Home. As he left the funeral home, he remarked, to no one in particular, "God knows I didn't want to do it, but Evelyn made me."

Later that day, assistant State's Attorney Colin Simpson read page 8 of defendant's confession to him wherein he admitted starting the fire, and asked him whether that was the statement he had told Mr. Tobias. Sergeant Gilliam testified that defendant told Mr. Simpson that he had confessed "Because it's true, I did it."

Defendant made a motion to quash the arrest and a motion to suppress statements. He did not testify at the motion to suppress statements. The trial court found that he had not been arrested until after he had made the written statement. The court further found his confession to be voluntary and that he waived his rights under *Miranda*.

## II. TRIAL

Mrs. Bowen testified that she had contacted an attorney in May 1977 for the purpose of obtaining a divorce. Mrs. Bowen indicated that defendant pleaded with her not to do it. On May 29, 1977, Mrs. Bowen stated that defendant tried to drag her to bed. She struck him with a book, freed herself and ran. He stated, "If you divorce me I'll kill you."

Mrs. Bowen indicated that on May 31, 1977, she and defendant argued about some insurance papers in the possession of a friend of Mrs. Bowen. He ran into the bedroom and began to kick a cedar chest that Mrs. Bowen's father had given her. He started cursing her. She screamed at him and he backed off.

The following day, Mrs. Bowen moved the cedar chest and some

other items to a friend's home and also to the Booth household. When defendant returned home that day he placed a heavy chain around Mrs. Bowen's neck and yelled, "Where's my stuff?" His oldest daughter began screaming and he released his wife. Mrs. Bowen and the children moved to the Booth household that day. On June 7, 1977, Mrs. Bowen signed a complaint for battery against defendant.

On June 25, 1977, Mrs. Bowen and Mrs. Booth noticed the youngest Bowen child, Mark, was missing. Mrs. Bowen drove Mrs. Booth's car over to defendant's house to retrieve Mark. He indicated that Mark was not there, whereupon Mrs. Bowen went to a neighbor's house to call Mrs. Booth to ask her to call the Cook County sheriff's police. Mrs. Bowen returned to defendant's house, blocking his driveway and car. He backed up against the car, denting it, and returned into the house. Mrs. Booth arrived in another car. Defendant came out with Mark and demanded that Mrs. Booth get off his property. Mark got into the car with his mother and Mrs. Bowen drove off when defendant began pounding his fists on the car window. Mrs. Booth returned home and called the police. She and Mrs. Bowen returned to defendant's house to fill out the accident report with two sheriff policemen. As Mrs. Booth and Mrs. Bowen drove away, Officer James Coakley heard defendant state "I will get her and the God damn kids too." After the fire, Officer Coakley advised Detective Peters as to what he heard him say that night.

On June 27, 1977, he called Mrs. Bowen and stated, "I'm through. I've had enough. If you or the kids try to contact me in any way, I'll have you killed."

Mrs. Bowen went to court on July 1, 1977, and obtained a temporary restraining order to keep defendant from having the children that weekend. He drove to the Booth house later that afternoon to see Mrs. Bowen in regard to some insurance papers. Mrs. Bowen refused to help him fill out the papers and he became angry. Mrs. Bowen ran inside and he broke open the front door. Mrs. Bowen called the Northlake police when he left.

Mrs. Marianne Booth stated she answered the telephone on June 17, 1977. Defendant stated "You're two dead m_____ f_____." He called again on June 22, 1977 and stated, "I'll burn down the house around you two whoring m_____ f_____, and I'll get my kids out."

Rebecca Gilliland, sister of defendant's friend, said that she talked with defendant the evening of July 1, 1977. She stated that he had been drinking. He began a conversation about his wife and accused his wife of going out with other men. He became angry as he talked. He asked Rebecca if she knew Mrs. Bowen and he were getting a divorce. He told Rebecca that "if [he] couldn't have the kids, that she wouldn't get the little son of bitches either; that he'd just burn them up."

Chief Julius Sharpy of the Northlake Fire Department determined that the fire originated in the front bedroom on the first floor of the house. No trace or odor of liquid accelerants was discovered and it was Sharpy's opinion that the fire had been burning approximately 45 minutes when the call came in at 4:30 a.m.

The Reverend Fred Moore, defendant's minister, testified that when he saw the defendant on July 2, 1977, at the police station, he was trembling and his hands were clammy. Defendant stated several times "I didn't do it" and gave Reverend Moore his version of the previous evening's activities. Reverend Moore asked him whether he had set the fire and he denied it. Reverend Moore next saw him the evening of July 3, 1977. He was trembling and his hands were clammy. Reverend Moore asked him whether he had set the fire and defendant replied, "Well, they said I did." Reverend Moore asked defendant about the signed confession and he responded, "Well, they told me that I did it."

Defendant testified he did not start the fire. He stated that when he left the tavern at 3 a.m. he went to the store for some ice cream and then went home to bed. Defendant further testified that Chief Gehrke stopped him from leaving the station on Sunday, July 3, 1977.

OPINION

■■ Defendant contends that the trial court erred in finding his confession voluntary. He contends he had denied involvement in the fire in which three of his children perished and confessed only after Chief Gehrke exhorted him "to make peace with yourself, your God, and your children." We reject defendant's contention.

In *People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870, our supreme court stated:

> "Whether a statement is voluntarily given depends upon the totality of the circumstances. The test is whether it had been made freely, voluntarily and without compulsion or inducement of any sort or whether the defendant's will was overcome at the time he confessed. [Citation.] In making its decision the trial court need not be convinced beyond a reasonable doubt, * * *." *Wipfler*, 68 Ill. 2d 158, 172, 368 N.E.2d 870, 875.

In *Wipfler*, the police chief, allegedly a sort of father image to the defendant, admonished defendant, "[I]f someone did something wrong he should be a man and admit it." (*Wipfler*, 68 Ill. 2d 158, 164, 368 N.E.2d 870, 871.) Defendant was interrogated and confessed.

The court held:

> "* * * mere exhortation to tell the truth does not render inadmissible a subsequent confession." *Wipfler*, 68 Ill. 2d 158, 173,

368 N.E.2d 870, 876; *People v. Dozier* (1979), 67 Ill. App. 3d 611, 615, 385 N.E.2d 155, 158.

The court further found that:

"The exhortation to defendant to be honest * * * can properly come from an interrogator." (*Wipfler*, 68 Ill. 2d 158, 173, 368 N.E.2d 870, 876.)

In the pending case defendant had voluntarily returned to the station on Sunday. He indicated he understood his rights were still in effect. He was neither arrested, handcuffed, searched, fingerprinted, threatened nor promised anything. In fact, he had viewed the remains of his children the previous day, breaking down briefly, but immediately regaining his composure. We find no psychological coercion under the totality of the circumstances. "[A] trial court's finding that a statement was voluntary will not be disturbed unless it is contrary to the manifest weight of evidence." *Dozier*, 67 Ill. App. 3d 611, 615, 385 N.E.2d 155, 158; *Wipfler*, 68 Ill. 2d 158, 172, 368 N.E.2d 870, 876.

Defendant next contends the trial court erred in refusing his involuntary manslaughter[1] instruction where there was evidence that the fire was set unintentionally, or if set intentionally, only to force his family to return home. We reject this contention because the record does not disclose evidence of recklessness.

■■ Defendant asserts that Reverend Moore's testimony supports an instruction on involuntary manslaughter. Defendant admitted to Reverend Moore that he used the lighter in order to see into the dark room. When the lighter struck the curtain, he withdrew his hand and fled. He did not ascertain whether the curtain ignited. This, the defendant asserts, is recklessness.[2] However, this testimony does not support an inference of recklessness. It does not show that defendant's mental state was one of recklessness or that any of his actions were accidental. Other evidence indicates that defendant made repeated threats to kill or burn his family. He admitted in his confession, and to Reverend Moore, that he was at the scene of the fire and struck the curtain, knowing that there were people in the house. This is an intentional act. A trial court does not err in refusing to submit to the jury an instruction on involuntary manslaughter where there is no evidence to justify the submission of such an instruction.

---

[1] Section 9—3(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 9—3(a)) defines involuntary manslaughter: "A person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly."

[2] Section 4—6 of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 4—6) defines recklessness: "A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation."

*People v. Leonard* (1980), 80 Ill. App. 3d 741, 400 N.E.2d 568; *People v. Panzer* (1979), 73 Ill. App. 3d 1, 391 N.E.2d 467.

Defendant's third contention is that the trial court committed reversible error in excluding the testimony of a defense expert witness, based on an objection that the hypothetical question omitted facts in evidence. Dr. Richard Ney, a psychologist, was asked the following hypothetical question:

> "Assume that a thirty-five year old individual with a 7th grade education who was estranged from his wife, having only been married once, the result of which was four children.
>
> Assume that on a day in 1977, this person was drinking alcoholic beverages from approximately five-thirty in the afternoon and at various periods until about three-thirty the following morning, consuming approximately twenty shots of liquor, and approximately the same number of beers.
>
> Assume that at approximately seven o'clock that morning, he learned that three of his children died in a fire, that he was escorted from the scene of where the fire occurred, to the Northlake Police Department. That at that time, his appearance was calm, and that from that point on, he was questioned at various times by police, assistant State's Attorneys, and also that at intervals, in between the questioning, he was left alone in an interview room. That he was taken to the Cook County Morgue to view the dead bodies of his children; that he was again questioned and accused of burning his house, killing his children.
>
> And at various intervals throughout the day, he had seen a minister who had questioned him concerning the events of that particular evening. That at approximately five o'clock in the afternoon, his appearance was sweating, that his hands were trembling and that he appeared to be nervous.
>
> That at eight o'clock that night, he went home but did not sleep and that at various intervals throughout the night, he became physically ill. That the following day, he was questioned again by police, again accused of murder, again accused of burning down his brother-in-law's house. That he was questioned in a room by a police chief for a period of over an hour, slightly over an hour. That again, he was accused by the police chief of murdering his children and that he was asked if he had anything to say about this fire, that now would be the time to clear his conscience on the matter and that thereafter, he gave a confession to the police.
>
> Do you have an opinion based upon a reasonable degree of certainty in the field of psychology as to whether or not a person

under those circumstances could confess to something he did not do?"

*Wirth v. Industrial Com.* (1974), 57 Ill. 2d 475, 312 N.E.2d 593, is controlling in Illinois with respect to hypothetical questions. Our supreme court stated:

"The more expedient and more widely prevailing view is that there is no rule requiring that all material facts be included. The safeguards are that the adversary may on cross examination supply omitted facts and ask the expert if his opinion would be modified by them, and further that the trial judge if he deems the original question unfair may in his discretion require that the hypothesis be reframed to supply an adequate basis for a helpful answer. [Citations.]" *Wirth*, 57 Ill. 2d 475, 480, 312 N.E.2d 593, 595; *Stephens v. Inland Tugs Company* (1976), 44 Ill. App. 3d 485, 358 N.E.2d 324.

■■ Although the trial court may have erred in excluding the defense expert witness' testimony, a careful review of the record does not indicate defendant was prejudiced thereby. As we stated in *People v. Mathis* (1977), 55 Ill. App. 3d 680, 688, 371 N.E.2d 245, 251, quoting from *Needy v. Sparks* (1977), 51 Ill. App. 3d 350, 372, 366 N.E.2d 327, 347:

"The object of [an appellate] court on review is not to determine whether the record is totally free of error, but whether any error occurred which operated to the prejudice of the appellant or unduly affected the outcome below."

■■ Defendant also contends that the trial court erred in refusing to read the list of witnesses to the first panel of sworn jurors. No objection was made during the voir dire or prior to the swearing in of the first panel. We must reject defendant's contention. The cases cited by defense (*People v. Cox* (1966), 74 Ill. App. 2d 342, 220 N.E.2d 7; *People v. Peterson* (1973), 15 Ill. App. 3d 110, 303 N.E.2d 514) to support its position, are distinguishable. In *Cox*, the trial was in progress when a highly prejudicial newspaper item appeared. The trial court failed to inquire whether any of the jurors had read the article and whether its reading would or could affect the verdict. In *Peterson*, a juror told defense counsel she "was praying that the defendant will plead guilty" so she could go home. The court failed to inquire as to the juror's impartiality. Both of these instances could affect a defendant's constitutional right to have a jury uncommitted on the question of his guilt or innocence. Thus, failure of the trial court to make an inquiry in those cases constituted reversible error.

In the present case, defense counsel submitted a list of 125 questions to the court for voir dire. There were no questions concerning the list of witnesses. Defense counsel only noted that the list of witnesses was not read to the first panel of jurors after they had been sworn in. The trial

court exercised its discretion and made a determination that no bias or prejudice would result to defendant by the failure to read the list of witnesses to the already sworn panel.

Supreme Court Rule 234 grants the court discretion in conducting the voir dire. (Ill. Rev. Stat. 1977, ch. 110A, par. 234, is applicable to criminal cases by Supreme Court Rule 431 (Ill. Rev. Stat. 1977, ch. 110A, par. 431).) Reversal of a conviction will only lie when there has been an abuse of that discretion whereby defendant would be denied an impartial hearing. There has been no abuse of discretion in the present case.

In *People v. Flowers* (1977), 52 Ill. App. 3d 430, 367 N.E.2d 389, defendant sought to have the court conduct a re-voir dire of the entire jury for potential prejudicial taint caused by the behavior of some jurors. Prior to the commencement of the trial, one juror sent a note to the judge asking the role of a foreman in case of a deadlock, and another juror asked to be excused because of an "uneasy feeling." The court held it was within the trial court's discretion to conduct a re-voir dire of the jury. "It is only the improper abuse of that discretion by the trial court that is error, not the refusal to interrogate the jury." *Flowers*, 52 Ill. App. 3d 430, 436, 367 N.E.2d 389, 394.

Defendant's last contention is that *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 98 S. Ct. 2248, requires a remand for consideration of whether his statements were obtained during custodial interrogation unsupported by probable cause. In *Dunaway*, defendant was picked up for questioning, without probable cause, in an attempted robbery and homicide matter. Defendant was not told he was under arrest, but he would have been physically restrained had he attempted to leave. He was given *Miranda* warnings but later made statements and drew sketches that incriminated him. The Supreme Court reversed the conviction, holding that defendant's fourth and fifth amendment rights were violated when he was seized for questioning without probable cause and no intervening events broke the connection between petitioner's illegal detention and confession.

Defendant asserts his "seizure and custodial interrogation" on Sunday, July 3, 1977, may constitute a *Dunaway* violation. Defendant did not testify at the motion to suppress statements. At trial, he testified that prior to the interrogation on Sunday, he attempted to leave the station but was prevented from doing so by Chief Gehrke.

We find no *Dunaway* violation of defendant's fourth and fifth amendment rights. Unlike the defendant in *Dunaway* who was at the station involuntarily for questioning and who would have been physically restrained from leaving, defendant here was at the station voluntarily to submit to questioning. Additionally, defendant was told he was free to leave and that his *Miranda* rights were still in effect. Defendant also later

affirmed to assistant State's Attorney Simpson that his confession was voluntary. The manifest weight of evidence in this case indicates no factual dispute regarding the voluntariness of defendant's presence at the station and his subsequent confession. Thus, it was not error for the trial court to deny defendant's motion to suppress. As such, *Dunaway* has no application in this case.

Affirmed.

SULLIVAN, P. J., and LORENZ, J., concur.