THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ULISES ARROYO, Defendant-Appellant.

First District (5th Division)    No. 1—99—4435

Opinion filed February 15, 2002.

278

Law Office of Thomas Peters, of Chicago (Thomas Peters, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Annette Collins, and Zachary M. Raimi, Assistant State's Attorneys, of counsel), for the People.

JUSTICE REID delivered the opinion of the court:

Following a bench trial, Ulises Arroyo was convicted of first degree murder (720 ILCS 5/9—1 (West 1996)) in the shooting death of Rudy Dellatorre just after midnight on June 14, 1997, during the street "celebration" which occurred after the Chicago Bulls won the NBA championship. He was sentenced to 35 years. On appeal, the defendant asserts that the trial court committed reversible error by not allowing the inculpatory statement of a nontestifying third person into evidence. Defendant also argues judicial error in denying his motion to suppress statements and in limiting testimony regarding incidents of past violent acts committed by members of the street gang which had initially instigated violence. Defendant further argues his guilt was not proved beyond a reasonable doubt and his sentence was excessive. For the following reasons, we affirm the conviction and sentence.

## THE FACTS

Arroyo, a member of the Milwaukee Kings street gang, watched

the championship game on television at his girlfriend's house. He is not a member of the Reese Park Imperial Kings. After the game, he went to meet another friend at the Apple Pantry near Fullerton and Marmora in Chicago. He had previously been told that, even though he was not an official member of the Reese Park Imperial Kings, he would be working security at the Apple Pantry in case anything happened. While this was transpiring, members of the Pachucos street gang were throwing bricks and bottles at cars passing through their territory. The Pachucos hit a car driven by Pedro Villalobos, a member of the rival Imperial Gangsters street gang. To help him retaliate, Villalobos recruited Imperial Gangsters as well as some of the Reese Park Imperial Kings. Villalobos went to the Apple Pantry and told everyone there, including Arroyo, what had happened to him. Several Imperial Gangsters and Reese Park Imperial Kings left the Apple Pantry, walking east on Fullerton toward Long where the bricks had been thrown. Once there, violence ensued.

Arroyo claimed he heard gunshots and someone's voice saying "they are bursting!" He claims he was told to shoot. Arroyo pulled his gun and shot in a northerly direction, up and over the heads of the crowd. He then left the scene to put the gun back in the Kings' hiding spot. Arroyo claims he did not aim at anyone specific and did not know anyone had been shot. When the shots were fired, Rudy Dellatorre was standing in the middle of a group of 20 to 25 people, waving a Mexican flag. Dellatorre was shot during the gunfire. He died the next day at Illinois Masonic Hospital.

While those events were transpiring, another group led by Oscar Molina and Luis Villalobos drove in a van painted a dark color to Fullerton and Long and opened fire on the Pachucos standing on the corner. On June 15, 1997, Molina and Villalobos were arrested. Molina confessed that he thought he hit someone while shooting his 9 millimeter handgun. Villalobos' statement corroborated Molina's statement. After Molina gave his statement, he fled the jurisdiction and was a fugitive at the time of Arroyo's trial.

Also, on June 15, 1997, at approximately noon, Arroyo was taken into custody by the police and brought to Area 5. Arroyo made a statement to the police in which he confessed to the crime orally and in a signed, handwritten statement.

During pretrial discovery, Arroyo filed a motion to suppress his statement. Arroyo claimed that the police had violated his fifth amendment rights because he was physically and psychologically coerced into confessing. At the time of the interrogation, Arroyo had no attorney present and no one from his family had been notified of his arrest. He was not arrested pursuant to a warrant and was not being interrogated by the arresting officers.

At the hearing on the motion to suppress, Arroyo testified that the police never informed him of the charges against him and refused upon request to allow him contact with an attorney. When Arroyo showed the police his attorney's business card, he claimed they tore it up and began slapping him. After a full day of interrogation which he claimed lasted 30 hours, Arroyo claims he succumbed to the pressure and signed the five-page statement written by an assistant State's Attorney. The claim that Arroyo was interrogated for 30 hours is disputed by the State. The arrest report shows that he was arrested June 15, 1997, at 8:30 p.m. The handwritten statement states it was created June 16, 1997, at 12 noon. Both of these documents are contained in the common law record. By the State's calculation, Arroyo was interrogated for only 16 hours.

During the motion to suppress, the defense called Arroyo, his mother, Yolanda Sharon, and his girlfriend, Lindora Cox. Arroyo testified he was threatened, coerced and hit in the head during the interrogation process. He also accused the police of preventing him access to his attorney by tearing up the attorney's card, which Arroyo carried. Arroyo's mother and girlfriend testified they had been looking for him the entire time he was being interrogated. The girlfriend testified that the police denied having Arroyo in their custody, even though he had been there for quite some time. The mother and girlfriend claimed they knew the police were lying because they saw Arroyo's car in the parking lot.

The investigation was conducted by Detectives Engel and Sofrenovic. At the motion to suppress, the State called Engel, who testified that he conducted a brief interview shortly after Arroyo arrived at the Area 5 station wherein he did not ask Arroyo about Dellatorre's death and did not mentally or physically coerce him in any way. He also denies that Arroyo requested his attorney or that the police contact Arroyo's family members.

Sofrenovic testified that he interviewed Arroyo at approximately 12:30 a.m. on June 16, 1997. He claims Arroyo was not cuffed at the time. Reading from a printed form, Sofrenovic informed Arroyo of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). Sofrenovic testified that Arroyo indicated he understood his rights and agreed to speak. The interview continued from 12:30 a.m. to approximately 4 a.m. At that point, Sofrenovic testified he read the *Miranda* rights a second time. Sofrenovic allegedly told Arroyo that his story did not wash because two witnesses placed defendant at the shooting and that the police had recovered a gun.

Arroyo's statement was memorialized at approximately noon on

the second day. At that point, Assistant State's Attorney Gallagher again read Arroyo his *Miranda* rights and took the statement. The statement was written by Gallagher, allegedly based on things Arroyo told him. Portions of the statement were read aloud in front of Arroyo, who made corrections which were initialed. Arroyo, Gallagher and Sofrenovic signed the statement once the corrections were made. The statement is nearly five pages in length, containing language that Arroyo was well treated and neither threatened nor coerced into making the statement.

At the close of the hearing on the motion to suppress, the trial court denied the motion, holding that it would resolve all issues of credibility between the defendant and the State in favor of the State.

Trial commenced on April 30, 1999. The State called Enereida Zendejas, who testified how Rudy Dellatorre was struck by a bullet. She testified that she observed a large group walking down Fullerton carrying bats and bottles. Zendejas then saw a light-colored van and a dark-colored car drive by the area. She testified she believed the shots came from one of the cars, not the group on the street. She also testified that she saw a Hispanic man come from the car who was approximately 6 feet 1 inch tall, weighing approximately 180 to 200 pounds.

The State also called Sergio Hernandez and Terrence Rizzo, members of the Milwaukee Kings street gang. They testified that they were with Arroyo on the night in question. The Pachucos threw bricks at Hernandez and the group with him. Hernandez testified he saw Arroyo fire a single shot, then run away. As Arroyo was running, Hernandez testified he heard three or four other shots from what sounded to him like a larger gun. Hernandez also testified that he did not see the bullet fired by Arroyo actually hit anyone. Rizzo also saw Arroyo shoot but did not see the bullet strike anybody. Rizzo testified to hearing a second volley of shots but that the shots did not come from Arroyo's gun. After the incident, Rizzo met up with Arroyo. According to Rizzo, Arroyo did not mention thinking he hit someone when he fired the gun. Arroyo then asked another gang member to put the gun in the gang's stash. Hernandez subsequently took the police to the stash where they recovered the .25-caliber handgun.

The State then called Sofrenovic, who testified consistently with his testimony at the motion to suppress. He testified that he spoke with Arroyo, Hernandez and Rizzo. Sofrenovic witnessed the writing of the handwritten statement. He also saw Arroyo sign the statement. On cross-examination, Sofrenovic admitted there was no lawyer present for any of the interrogation and that certain details were missing from the statement. Sofrenovic, through testimony, published the

statement to the trial court. The statement indicated that Arroyo got the gun from a gang member named Jowers. Arroyo was carrying the gun "just in case anything happened." Arroyo knew he was the only person in his group with a gun. He also heard the Pachucos did not have guns. The statement also states that defendant fired four shots into the crowd. Arroyo thought he might have hit someone but was uncertain.

On cross-examination, Sofrenovic testified about the oral statement Arroyo gave before the handwritten statement. In the oral statement, Arroyo allegedly told the police that he did not know if the Imperial Gangsters or Maniac Latin Disciples carried firearms when they left to go to the scene of the shooting. However, Arroyo later contradicted himself by stating that he knew someone had a 9 millimeter gun. Arroyo told Sofrenovic that he knew the person with the gun would be east of the Pachucos. Further, Arroyo stated that when he heard his own group members yell "shoot shoot" he did not know whether the Pachucos had a gun. Sofrenovic testified that the police recovered a 9 millimeter gun from Molina that same day.

Prior to resting its case in chief, the State introduced two stipulations into evidence. The first contained stipulated testimony of the medical examiner that the victim died from a gunshot to the right side of the head. The medical examiner would have testified that the bullet was a small caliber, copper-jacketed bullet. The second stipulation was of a firearms expert named Sanchez. Sanchez would have testified that the bullet recovered from Dellatorre's head had been fired from the .25-caliber handgun recovered from the Milwaukee Kings' stash. This concluded the State's case in chief. Defendant unsuccessfully moved for a directed verdict.

The defendant's case in chief began with Arroyo himself. Arroyo testified that he and some others met members of the Imperial Gangsters and Maniac Latin Disciples around Fullerton and McVicker. Arroyo said he agreed to go along and help the other gangs fight the Pachucos. He admitted he was carrying a gun, "in case anything goes down, anybody ends up shooting or pulls a gun or anything like that." When they arrived on the scene, both sides began throwing things at each other.

Arroyo testified he stood by himself on the southwest corner of Fullerton and Long where he heard shots fired. He testified he did not know from where the shots had come. In response to the shots, Arroyo drew his gun and fired three or four bullets in an attempt to "scare them off." Arroyo shot in a northwest direction but did not aim at anyone. After the shooting, Arroyo headed westbound away from the scene. He gave the gun to Jowers and did not learn anyone had been

shot until he was arrested and taken to Area 5. Arroyo testified that he spent 30 hours at Area 5 before giving his statement. Arroyo claimed he did not read the statement or have it read to him by the police before he signed it. Arroyo also testified about other incidents with the Pachucos. This included an auto collision, an incident when a Pachucos member allegedly pointed a gun at Arroyo, and a third incident where Arroyo allegedly heard that the Pachucos shot at other gang members.

Fernando Perez testified on Arroyo's behalf. He was a codefendant until he pled guilty and was sentenced to four years. Luis Villalobos also testified on Arroyo's behalf. He had been charged with murder but pled guilty to discharge of a firearm and was sentenced to six years. Villalobos gave a statement which indicated that Molina also had a gun that evening. Perez testified that he learned that Molina's gun was a 9 millimeter. Though he heard two groups of gunshots that night, Villalobos testified he did not actually see anybody shooting either gun.

At the close of his case in chief, Arroyo moved to have Molina's statement to the State's Attorney admitted into evidence. The trial court took notice that Molina was out of the jurisdiction, possibly out of the country, and refused to admit the statement into evidence. The trial court ruled that the statement lacked sufficient indicia of reliability to justify its admission into evidence. Arroyo was found guilty of first degree murder. He was sentenced to 35 years.

## ANALYSIS

### I

Arroyo argues on appeal that the trial court's refusal to admit the Molina statement because it purportedly lacked an indicia of reliability was error which he claims resulted in prejudice to him. He argues that the indicia of reliability overwhelmingly favored admission of the confession because it was made when Molina was in custody, during an interrogation when Molina was anything but safe from prosecution. Arroyo also argues that, since the confession was made while Molina was in police custody, it is far more reliable than had it been made outside of police custody.

The State responds that the confession lacked sufficient indicia of reliability and therefore the trial court was correct in barring its admission. The State argues that, since Arroyo failed to make the Molina statement part of the record on appeal, it is unclear what the confession actually said. Since it was not included in the record, the State argues that Arroyo cannot actually show how the trial court allegedly abused its discretion.

■ In determining whether or not to allow the admission of an incriminating statement by a third party, courts follow the guidelines articulated in *Chambers v. Mississippi*, 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038 (1973), and its progeny. In general, a declarant's unsworn, out-of-court statement that he committed the crime for which a defendant is charged is inadmissible hearsay, even though the statement is against the declarant's penal interest. *People v. McCallister*, 193 Ill. 2d 63, 100 (2000), citing *People v. Tate*, 87 Ill. 2d 134, 143 (1981). However, such a statement may be admitted under the statement-against-penal-interest exception to the hearsay rule if the statement contains sufficient indicia of reliability and if justice so requires. *McCallister*, 193 Ill. 2d at 100, citing *People v. Bowel*, 111 Ill. 2d 58, 66 (1986), citing *Chambers v. Mississippi*, 410 U.S. 284, 302, 35 L. Ed. 2d 297, 313, 93 S. Ct. 1038, 1049 (1973) ("the hearsay rule may not be applied mechanistically to defeat the ends of justice").

■ To determine whether a statement contains sufficient indicia of reliability, courts look foremost to whether the statement is self-incriminating and against the declarant's interest. *McCallister*, 193 Ill. 2d at 100, citing *People v. Keene*, 169 Ill. 2d 1, 29 (1995). Courts also look to whether the statement was made spontaneously to a close acquaintance shortly after the crime occurred; whether the statement was corroborated by other evidence; and whether there was adequate opportunity for cross-examination of the declarant. These latter factors are not "hard and fast requirements" for admissibility but, instead, are simply "indicia" of trustworthiness. *McCallister*, 193 Ill. 2d at 100, citing *People v. House*, 141 Ill. 2d 323, 390 (1990), citing *Bowel*, 111 Ill. 2d at 67; *Keene*, 169 Ill. 2d at 29. In every case, the ultimate question in deciding the admissibility of the hearsay declaration is whether it was " 'made under circumstances which provide "considerable assurance" of its reliability by objective indicia of trustworthiness.' " *McCallister*, 193 Ill. 2d at 100-01, quoting *Bowel*, 111 Ill. 2d at 67, quoting *Chambers*, 410 U.S. at 300-01, 35 L. Ed. 2d at 311-12, 93 S. Ct. at 1048-49. Whether a statement is admissible under the statement-against-penal-interest exception to the hearsay rule rests within the sound discretion of the trial court. *McCallister*, 193 Ill. 2d at 101, citing *Bowel*, 111 Ill. 2d at 68.

■ In the case *sub judice*, the trial court properly held Molina's statement to be inadmissible because the *Chambers* exception to the hearsay rule applies only to "a declarant's unsworn, out-of-court statement that he committed the crime for which a defendant is charged." *McCallister*, 193 Ill. 2d at 100. Molina's statement that he fired a 9 millimeter handgun in the vicinity where the victim was shot in the head by a .25-caliber bullet fired from Arroyo's gun in no way indicates

that Molina "committed the crime for which [Arroyo] is charged." As Molina's unsworn, out-of-court statement did not comprise an admission that he committed the murder at issue, it could not have been admitted under the *Chambers* exception. For the same reason, Molina's statement also did not contain sufficient indicia of reliability and, most importantly, justice did not require its admittance. In both the trial court and on appeal, defendant has completely failed to present any plausible basis to find that the interests of justice would be served by admitting Molina's statement. Indeed, a strong argument could be made that defendant's failure to make Molina's entire statement part of the record was a purposeful effort to obfuscate this issue. The trial court's ruling that Molina's statement was inadmissible hearsay was correct.

## II

Arroyo next argues that the trial court improperly denied his motion to suppress his confession. He claims the confession was improperly obtained after 30 hours of interrogation in police custody without benefit of counsel. Arroyo claims that the trial court failed to give sufficient weight to the effects of his prolonged isolation. In this way, Arroyo argues he was effectively denied his constitutional right to counsel. The State responds that the confession was voluntary and that Arroyo was repeatedly informed of his *Miranda* rights. The State argues it established by a preponderance of the evidence that the confession was voluntarily given and that Arroyo was well treated during his interrogation.

■ It is a fundamental principle of criminal procedure that a confession must be voluntary; otherwise it is inadmissible. *People v. Gilliam*, 172 Ill. 2d 484, 501 (1996). In determining whether a confession was voluntary, we must consider the totality of the circumstances. *In re G.O.*, 191 Ill. 2d 37, 54 (2000), citing *Gilliam*, 172 Ill. 2d at 500. Factors to consider include the respondent's age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning; the legality and duration of the detention; the duration of the questioning; and any physical or mental abuse by police, including the existence of threats or promises. *G.O.*, 191 Ill. 2d at 54, citing *Gilliam*, 172 Ill. 2d at 500-01. Significantly, no single factor is dispositive. *G.O.*, 191 Ill. 2d at 54, citing *Gilliam*, 172 Ill. 2d at 500. The test of voluntariness is whether the respondent " 'made the statement freely, voluntarily, and without compulsion or inducement of any sort, or whether the [respondent's] will was overcome at the time he or she confessed.' " *G.O.*, 191 Ill. 2d at 54, quoting *Gilliam*, 172 Ill. 2d at 500. "The benchmark for voluntariness

is not whether the defendant would have confessed in the absence of interrogation but, rather, whether the defendant's will was overborne at the time of the confession." *People v. Brown*, 169 Ill. 2d 132, 144 (1996), citing *People v. House*, 141 Ill. 2d 323, 376 (1990); *People v. Terrell*, 132 Ill. 2d 178, 198 (1989). "Consequently, in reviewing whether respondent's confession was voluntary, we will accord great deference to the trial court's factual findings, and we will reverse those findings only if they are against the manifest weight of the evidence. However, we will review *de novo* the ultimate question of whether the confession was voluntary. We caution that, for this standard of review to function as it is intended, trial courts must exercise their responsibility to make factual findings when ruling on motions to suppress. Reviewing courts should not be required to surmise what factual findings that the trial court made. Instead, the trial court should make clear any factual findings upon which it is relying. It is only through this synergy between the trial and reviewing courts that appellate courts can develop a uniform body of precedent to guide law enforcement officers in their determination of whether their actions may violate the constitution." *G.O.*, 191 Ill. 2d at 50.

▮ The most disturbing claim made by Arroyo is that he asserted his right to an attorney, pulled out his attorney's business card, only to have the police officer seize the business card and tear it up in his face. This alone would be sufficient to invalidate the confession and exclude it from evidence as a violation of the defendant's right to counsel. U.S. Const., amends. V, XIV; *Miranda*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602; *People v. Smith*, 93 Ill. 2d 179 (1982). The State urges this court to accept the finding of the trial court, which found the denial of this claim by the State to be more credible. On this record, we cannot hold that the trial court's ruling is contrary to the manifest weight of the evidence presented on this issue.

The undisputed evidence is that the interrogation took place over a substantial period of time. Arroyo was repeatedly read his rights. He was provided with food and drink. He admitted he was well treated during his interrogation and was not subjected to punishment. Though Arroyo made some claims of mistreatment, the trial court also found those claims incredible. The trial court rejected Arroyo's arguments, in part, because the police gave him long breaks between questioning and allowed him time to rest in addition to providing him with food and drinks.

Arroyo argues that this case should have the same result as *People v. Hardway*, 163 Ill. App. 3d 596 (1987), wherein that defendant's confession was found to be the result of an unlawful detention. Though *Hardway* might superficially seem similar to the case at bar, it is

readily distinguishable. *Hardway* turned on whether that detention resembled a traditional arrest or whether a reasonable person would not have believed he was free to leave. *Hardway*, 163 Ill. App. 3d at 601, citing *People v. Towne*, 91 Ill. 2d 32 (1982). That defendant was not told whether or not he was under arrest. He was also not told that he need not accompany the police officers to the station. This is factually specific and quite unlike Arroyo's situation. Arroyo had no doubt he was under arrest. He does not dispute that he was detained, merely that, in his opinion, the detention was too long. Arroyo would have this court consider the length of time of the detention as though that were the only fact to be considered. This we cannot do because such an approach would be too rigid and would fail to take into account the totality of the circumstances. The evidence presented at the motion to suppress is directly in conflict. If the defendant's witnesses are to be believed, the statement should be suppressed. If the State's witnesses are to be believed, the motion to suppress was properly denied. These evidentiary conflicts were resolved by the trial court in favor of the State's witnesses. Given the great deference we must give to such findings, we cannot say that the trial court abused its discretion in denying defendant's motion to suppress. *G.O.*, 191 Ill. 2d at 50.

## III

Arroyo next claims the trial court denied him his right to confront certain witnesses when it restricted testimony concerning prior acts of violence by the Pachucos against Arroyo personally and their previous history of violence in general. In his testimony, Arroyo was allowed to make some mention of the Pachucos' prior acts but was limited in other respects. He argues that any actions by the trial court to limit or foreclose such testimony was error. The State responds that, since the trial court allowed Arroyo to elicit testimony from several witnesses about the Pachucos' reputation for violence, the rulings did not deny Arroyo his right of confrontation. The State points out that, since Arroyo did not include this issue in a posttrial motion and did not object to the trial court's handling of the issue, it should be treated as having been waived. The State points out that, in the posttrial motion, Arroyo only argued that the trial court violated his right to impeach the witness, not the right of confrontation. Next, the State argues that Arroyo failed to explain exactly how the alleged error actually deprived him of his right of confrontation. Finally, the State urges this court to treat the alleged error as harmless.

The trial court entertained a posttrial motion for a new trial on December 2, 1999. Though Arroyo's motion included a claim of judicial error for restricting his witnesses' testimony to prior acts of violence

by the Pachucos, it was raised in context of a self-defense claim. No mention in the motion was made of the confrontation clause of the United States Constitution. "Failure to specify grounds for a new trial in writing in a motion for a new trial has been held by this court to constitute waiver of the issue on review in the absence of plain error." *People v. Enoch*, 122 Ill. 2d 176, 187 (1988). Moreover, this court has previously held that " 'general and vague allegations in a posttrial motion are not sufficient to overcome waiver.' " *People v. Knight*, 323 Ill. App. 3d 1117, 1124 (2001), quoting *People v. Parchman*, 302 Ill. App. 3d 627, 632 (1998). " 'Failure to raise issues in the trial court denies that court the opportunity to grant a new trial, if warranted. This casts a needless burden of preparing and processing appeals upon appellate counsel for the defense, the prosecution, and upon the court of review. Without a post-trial motion limiting the consideration to errors considered significant, the appeal is open-ended. Appellate counsel may comb the record for every semblance of error and raise issues on appeal whether or not trial counsel considered them of any importance.' " *Enoch*, 122 Ill. 2d at 186, quoting *People v. Caballero*, 102 Ill. 2d 23, 31-32 (1984).

■ A trial court has wide discretion to restrict the scope of cross-examination but must first allow sufficient cross-examination to satisfy the confrontation required under the sixth amendment as a matter of right. *People v. Brown*, 243 Ill. App. 3d 1057, 1063 (1993). "To determine if the cross-examination allowed satisfied the constitutional requirement, a court 'should look not to what a defendant had been prohibited from doing, but to what he had been allowed to do.' " *Brown*, 243 Ill. App. 3d at 1063, quoting *People v. Edwards*, 218 Ill. App. 3d 184, 194 (1991). A reviewing court should interfere with the trial court's decision involving the latitude of cross-examination only when the trial court clearly abused its discretion and manifest prejudice to the defendant resulted. *Brown*, 243 Ill. App. 3d at 1063, citing *People v. Edwards*, 218 Ill. App. 3d at 193. In the case at bar, the trial court gave the defense counsel latitude to question the witnesses about the Pachucos. The trial court limited questions in scope but still allowed some questions, provided the questions were not vague or based upon hearsay. These limitations were not outside the scope of the trial court's authority. Absent an abuse of discretion, this court cannot find error on the part of the trial court.

## IV

■ Arroyo next argues that the case against him was insufficient to convict him beyond a reasonable doubt. "[T]he State carries the burden of proving beyond a reasonable doubt each element of the of-

fense and the defendant's guilt." *People v. Maggette*, 195 Ill. 2d 336, 353 (2001), citing *People v. Ware*, 23 Ill. 2d 59, 62 (1961). A reviewing court will not set aside a criminal conviction on grounds of insufficient evidence unless the proof is so improbable or unsatisfactory that there exists a reasonable doubt of the defendant's guilt. When considering the sufficiency of the evidence, it is not the function of a reviewing court to retry the defendant. Rather, the relevant question is whether, after reviewing all of the evidence in the light most favorable to the prosecution, any rational fact finder could have found beyond a reasonable doubt the essential elements of the crime. *Maggette*, 195 Ill. 2d at 353, citing *People v. Tye*, 141 Ill. 2d 1, 13-14 (1990); *People v. Phillips*, 127 Ill. 2d 499, 509-10 (1989). We note that this standard of review applies in all criminal cases, whether the evidence is direct or circumstantial. *Maggette*, 195 Ill. 2d at 353, citing *People v. Gilliam*, 172 Ill. 2d 484, 515 (1996); *People v. Campbell*, 146 Ill. 2d 363, 374-75 (1992). It is well settled that when a case is tried without a jury, it is the responsibility of the trial judge to determine the credibility of the witnesses and weight to be given their testimony, and where the evidence is merely conflicting, a reviewing court will not substitute its judgment for that of the trier of fact who heard the evidence. *Hardway*, 163 Ill. App. 3d at 601, citing *People v. Woods*, 81 Ill. 2d 537 (1980). In the case *sub judice*, two credible eyewitnesses watched Arroyo shoot a .25-caliber gun in the direction of the Pachucos on the night of the incident. Sometime after the shooting, one of the eyewitnesses watched Arroyo turn a .25-caliber gun over to a fellow gang member and ask him to put it in the stash. All of the eyewitness testimony exists in conjunction with Arroyo's own confession, in which he indicated that he shot his .25-caliber weapon, which might have hit someone. Additionally, all of this testimonial evidence is corroborated by the forensic evidence in this matter. The medical examiner removed a .25-caliber bullet from the deceased's head. This bullet was scientifically confirmed to have been fired from the same gun Arroyo fired. The State argues that this evidence is overwhelming in its support for Arroyo's conviction. We agree.

## V

█ Finally, Arroyo argues that the sentence imposed was disproportionate to the crime for which he was charged. The State responds that a 35-year prison term for murder is within the statutory guidelines and is reasonable under the circumstances. We agree. It is well settled that the trial court has broad discretionary powers in imposing a sentence. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000), citing *People v. Fern*, 189 Ill. 2d 48, 53 (1999). The trial court's sentenc-

ing decision is entitled to great deference. *Stacey*, 193 Ill. 2d at 209, citing *People v. Perruquet*, 68 Ill. 2d 149, 154 (1977). The trial court is granted such deference because the trial court is generally in a better position than the reviewing court to determine the appropriate sentence. The trial judge has the opportunity to weigh such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *Stacey*, 193 Ill. 2d at 209, citing *People v. Streit*, 142 Ill. 2d 13, 19 (1991); *Perruquet*, 68 Ill. 2d at 154. Consequently, the reviewing court must not substitute its judgment for that of the trial court merely because it would have weighed these factors differently. *Stacey*, 193 Ill. 2d at 209, citing *Streit*, 142 Ill. 2d at 19. Arroyo's sentence is within the statutory guidelines for a crime of this nature. "A sentence within statutory limits will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *Fern*, 189 Ill. 2d at 54, citing *People v. Cabrera*, 116 Ill. 2d 474, 493-94 (1987). This record does not support Arroyo's claim that the sentence was disproportionate.

## CONCLUSION

In light of the foregoing, the judgment of the trial court is affirmed.

Affirmed.

GREIMAN and QUINN, JJ., concur.