THIRD DIVISION

March 19, 2003

No. 1-
00-3759

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Cook County.

)

v. )

) 

NINOS GORGIS, ) Honorable

)
 Joseph Urso and

)
 Thomas P. Fecarotta, Jr.,

Defendant-Appellant. 
 ) Judges Presiding.

)

PRESIDING JUSTICE SOUTH delivered the opinion of the court:

This appeal arises from defendant's convictions for first degree murder and aggravated 
discharge of a firearm following a simultaneous, severed jury trial with codefendants Bretton Holman and Raul Negrete, who were both tried to the bench.  Codefendant Holman was acquitted, while codefendant Negrete was convicted and sentenced to a 20-year prison term.  Codefendant Negrete is not a party to this appeal.
(footnote: 1)  Defendant was sentenced to concurrent sentences of 40 years' imprisonment for murder and 10 years' imprisonment for aggravated discharge of a firearm. 

Prior to trial, defendant filed a motion to suppress his confession.  In that motion, he alleged that before he made an inculpatory statement, he was falsely promised a reduction in the charge if he admitted his participation in the shooting.  Defendant further alleged that the assistant State's Attorney added to the psychological coercion by falsely informing him that he may be charged with manslaughter.  Defendant concluded that because his confession was psychologically coerced and involuntary, it should have been suppressed at trial.

Detective Joe Belmonte testified that he worked for the Village of Mount Prospect and was assigned to investigate the shooting death of Dareth Womack on April 24, 1999.  As part of that investigation, he interviewed defendant at the Mount Prospect police department.  Also present for the interview was Assistant State's Attorney (ASA) Mary Beth Kinnerk.  Prior to the interview, defendant was advised of his 
Miranda
 warnings by ASA Kinnerk from a preprinted form, which was provided by the Mount Prospect police department.  After stating that he understood his rights, defendant agreed to make a statement, and the interview lasted approximately 30 minutes.  At the conclusion of that interview, defendant requested to speak to his cousin, Ashor Jajou.  Both Detective Belmonte and ASA Kinnerk left the room, and arrangements were made to accommodate defendant's request.  Approximately one hour later, Detective Belmonte and ASA Kinnerk returned with Ashor Jajou.  Jajou told defendant, "Bro, you have to do the right thing, this sh-- has got to stop.  Somebody's dead now."  Shortly after that statement was made, Detective Belmonte escorted Jajou out of the interview room.  When Detective Belmonte returned, ASA Kinnerk met him at the door and requested that he get water and tissue for defendant, which he did.  ASA Kinnerk then informed him that defendant wanted to speak to her alone.  Aside from those conversations, neither Detective Belmonte nor any other police personnel spoke with defendant.  Detective Belmonte testified that neither he nor anyone else made false promises to defendant in exchange for his confession.  Detective Belmonte was then questioned as to whether ASA Kinnerk informed defendant that he may be charged with manslaughter, to which Detective Belmonte responded, "Yes."  

On cross-examination, Detective Belmonte testified that defendant had been brought to the station at about noon and was not questioned prior to 8 p.m.  At that time, defendant initially denied his involvement in the shooting.  Detective Belmonte spoke with Jajou before he spoke with defendant.  Defense counsel then questioned Detective Belmonte as to whether he said anything to defendant regarding his cooperation with the police, to which he responded, "No."  Defense counsel's questions concerning whether there was any discussion between Detective Belmonte and ASA Kinnerk concerning the charges to be brought against defendant were objected to by the State, and those objections were sustained by the trial court.  Detective Belmonte further testified that Jajou was at the station because he had been detained for an unrelated  matter by another department. 

ASA Mary Beth Kinnerk testified for the State that on April 24, 1999, she was assigned to an in-progress investigation with the Mount Prospect police department regarding the homicide of Dareth Womack.  At 8 p.m. she and Detective Belmonte interviewed defendant.  Prior to the interview, ASA Kinnerk advised defendant that she was not his lawyer, and she also advised him of his 
Miranda
 rights from a preprinted form, which was supplied by the Mount Prospect police department and which defendant subsequently signed.  Defendant then agreed to speak with her, and the subsequent conversation lasted approximately 30 minutes.  At the conclusion of that conversation, defendant asked to speak with his cousin, Jajou, and Kinnerk and Detective Belmonte went to locate Jajou.  They returned with Jajou at approximately 9 p.m.  Jajou initially spoke to defendant in what ASA Kinnerk believed was Spanish, but Detective Belmonte told him to speak English.  At that point, Jajou told defendant, "Look, somebody's dead.  This has gotta stop.  You've got to tell the truth."  Immediately thereafter, Detective Belmonte escorted Jajou from the interview room.  ASA Kinnerk was left alone with defendant, and he began to cry.  Defendant then indicated that he wanted a glass of water, and when Detective Belmonte returned to the room, ASA Kinnerk asked him to get defendant a glass of water and some tissue.  When Detective Belmonte returned with those items, ASA Kinnerk informed him that defendant wanted to speak to her alone and that he did not want any police officers in the room.  ASA Kinnerk and defendant subsequently had an hour-long conversation, after which she asked defendant whether he would agree to have his statement memorialized in either a handwritten or a court-reported statement, and she explained the difference between the two.  Defendant indicated that he did not want anyone else present and that he wanted a handwritten statement.  ASA Kinnerk began to write defendant's statement at approximately 10:30 p.m. while he ate dinner.  It took her about an hour to write the statement, after which she went over the entire statement with defendant.  Defendant was sitting next to ASA Kinnerk as she read the statement out loud to him.  Defendant made corrections to the statement as she read.  After all corrections had been made, both she and defendant signed the statement, a copy of
 which she identified at the hearing.  ASA Kinnerk denied that she or anyone else made any promises to defendant if he admitted to participating in the shooting.  She also denied telling defendant that he would be or may be charged with manslaughter.

On cross-examination, ASA Kinnerk testified that she arrived at the station at 7 p.m., at which time she learned that defendant had been in custody at another police department on a different matter prior to being brought to the Mount Prospect police station.  When she first spoke with defendant at 8 p.m. in Detective Belmonte's presence, defendant denied any involvement in the shooting.  After that initial conversation, she and Detective Belmonte left the room and did not return until defendant's cousin was available to speak with him.  ASA Kinnerk indicated that during her second conversation with defendant, there was a discussion of possible charges for the shooting, but that she told defendant involuntary manslaughter was not a possible charge.  Defendant asked her what the shooter would be looking at and she told him first degree murder.  He then asked about second degree murder, to which she responded that there was no second degree murder charge in Illinois and that one can only be found guilty of second degree murder after first being found guilty of first degree murder with some mitigating circumstances.  Defendant then asked about manslaughter, to which she responded that involuntary manslaughter did not apply to a gang-related, drive-by shooting.  ASA Kinnerk then showed defendant in her statute book that drive-by shootings were under the first degree murder heading.  Defense counsel then asked ASA Kinnerk whether "it seemed to [her] as though Mr. Jajou was suggesting to [defendant] that he should take responsibility for the shooting which occurred."  An objection to that question was sustained by the court.  ASA Kinnerk testified that they never discussed the charges after that initial inquiry by defendant.

On redirect, ASA Kinnerk testified that prior to her interview with defendant, she was aware of statements that had been made by the two codefendants, both of which implicated defendant as the shooter.  She also testified that it was defendant's questioning which led to her explanation of the various charges of first degree murder, second degree murder and manslaughter.  

Defendant then testified on his own behalf that after he denied shooting the victim, Detective Belmonte came into the interview room and told him that he was being charged with murder and said, "your boys ratted on you."  ASA Kinnerk then arrived and introduced herself.  They talked, and then Jajou was brought in.  Defendant testified that Jajou was his cousin but was not involved with any gang.  Detective Belmonte and ASA Kinnerk were both present while defendant and Jajou talked.  Afterwards, ASA Kinnerk told defendant she would try to charge him with involuntary manslaughter if he changed his story.  Defendant and ASA Kinnerk then had a private conversation, during which they discussed the facts of the victim's shooting, after which, defendant agreed to sign a statement.  Defendant testified that ASA Kinnerk helped him make the statement seem like involuntary manslaughter and that her statements gave him hope, which is why he signed the statement.  

On cross-examination, defendant testified that he thought his cousin was telling him to take the rap.  He could not remember whether ASA Kinnerk explained to him the difference between first and second degree murder but did remember looking at the statute book with her.  Defendant did not recall whether he was given a choice of having a handwritten or court-reported statement but did recall choosing a handwritten one.  He testified that he read the statement before signing it in several places and acknowledged that the statement indicated that it was freely and voluntarily given, and that no promises had been made in connection with it.  

At the close of the evidence, the court found that defendant's statement was not the product of psychological or any other type of coercion and that defendant's will was not overborne in any way.  The trial court also found that there were no promises made to defendant regarding involuntary manslaughter and denied defendant's motion to suppress the statement.

The first State witness to testify was Stephanie Griffin.  On April 24, 1999, at approximately 12:30 a.m., she was a front-seat passenger in a white Lincoln that was en route to an Amoco gas station.  Dareth Womack, the victim, was driving.  She knew that Dareth was a member of the Gangster Disciples.  At some point, a red pickup truck containing three people pulled up beside them.   The driver of this truck, his front seat passenger and the passenger in the bed of the truck all appeared to be male Hispanics.  The individual in the bed of the truck threw up a Latin Kings sign.  At that time, according to Griffin, the Latin Kings and the Gangster Disciples were rivals.

Dareth continued driving until they reached the gas station, and the red pickup truck followed them.  Dareth told her he was not going to do anything because she was in the car, so he turned to his left and waved to the men in the truck.  Stephanie described this wave as "sarcastic." Within 30 seconds three shots were fired from the truck into their car, one of which struck and killed Dareth.  Stephanie jumped out of the car and ran into the mini-mart at the gas station and informed the clerk that her friend had just been shot.  The police were notified and came to the gas station.  Although Stephanie viewed a lineup, she was unable to identify anyone.

Officer Paul Settecase of the Glenview police department testified as an expert witness on gang crimes.   In April of 1999, the Latin Kings and the Gangster Disciples were rivals.  Officer Settecase testified that based upon his experience, defendant was a member of the Latin Kings at the time of the shooting, and the victim was a member of the Gangster Disciples.

Detective Belmonte's trial testimony was substantially the same as his testimony at the pretrial hearing.  On April 24, 1999, he was contacted by the Glenview police department, which informed him that they had a suspect in mind who might have some connection to the shooting.  After speaking with that suspect, Detective Belmonte began searching for two other suspects, one of whom was defendant.  Later that evening, Detective Belmonte and ASA Kinnerk had a 30-minute conversation with defendant, after which, defendant wanted to know with what crime the shooter could be charged.  When ASA Kinnerk told him first degree murder, defendant asked about second degree murder and involuntary manslaughter.  ASA Kinnerk then informed defendant that a person could not be charged with second degree murder unless he was first convicted of first degree murder and that involuntary manslaughter did not apply.  ASA Kinnerk then pulled out her Illinois Compiled Statutes book and circled the section related to drive-by shootings, which was under the first degree murder section of the statute.  Defendant then asked to speak to his cousin, Jajou.  Subsequent to that conversation with Jajou, defendant spoke with ASA Kinnerk alone, and Detective Belmonte had no further conversation with defendant.

On cross-examination, Detective Belmonte testified that although he knew Jajou to be defendant's fellow Latin Kings gang member, he did not know whether he was the "head" of the Latin Kings on the north shore.  He also testified that prior to the initial interview with defendant, he and ASA Kinnerk had discussed interviews he had with the codefendants who were in custody, and that he told defendant what his codefendants had said about his involvement in the shooting.  He testified that he heard ASA Kinnerk explain the charge of involuntary manslaughter after defendant inquired about it.   

ASA Kinnerk's trial testimony was consistent with her pretrial testimony.  Initially, when she first spoke with defendant at 8 p.m., he denied involvement in the shooting.  Defendant then inquired about the charges the shooter would be looking at, and ASA Kinnerk explained them to him.  Defendant then asked to speak to his cousin, Jajou.  After his cousin spoke to him and left the room, defendant began to cry.  Defendant then stated that he would tell ASA Kinnerk what happened, but that he did not want to talk to any policemen.  ASA Kinnerk relayed that information to Detective Belmonte, and he left her alone with defendant.  They spoke for approximately one hour, after which ASA Kinnerk asked defendant if he wanted to memorialize his statement in handwritten or court-reported form.  Defendant chose a handwritten statement, and ASA Kinnerk subsequently wrote out the statement, which she reviewed with defendant.  After having the opportunity to make corrections to the statement, defendant signed the statement on each page.  

On cross-examination, ASA Kinnerk denied telling defendant that she would help him or that she would charge him with manslaughter.  

Defendant's statement was then published to the jury as follows: On April 23, 1999, defendant was a member of the Latin Kings gang as a soldier and he had gotten a gun from a fellow Latin Kings.  Codefendants Negrete and Holman, who were also Latin Kings, knew that he had the gun, and the three of them decided to ride around their neighborhood in Holman's red truck.  Defendant was working security and sat in the bed area of the truck.  They drove around their neighborhood, and when they did not find any rival gang members, they decided to drive into rival gang (Gangster Disciples) territory.  Defendant then saw a white Lincoln automobile driven by a member of the Gangster Disciples that he knew as Mashod (Dareth Mashod Womack) pulling into a gas station.  Defendant saw Mashod throw up the pitchfork, which was a sign of disrespect to defendant, who responded by throwing down the pitchfork.  Mashod responded by dropping the crown, which meant "king killer," and defendant represented back with a crown up.   Holman then pulled the truck around the corner and Mashod pulled his car towards one of the pumps at the gas station.  Defendant assumed that Mashod was "strapping," meaning carrying a gun, so defendant fired three shots in the direction of Mashod's car.  Defendant never saw Mashod with a gun but assumed that the passenger in Mashod's car was a male and Mashod's fellow gang member; if he had known there was a girl in the car, he would never have shot at Mashod.  Defendant and his codefendants then drove away, and defendant gave the gun to codefendant Negrete and did not know what he did with it.  

Defendant testified on his own behalf that he was a member of the Latin Kings gang with an entry-level position as a soldier.  Jajou was the chief of the gang who gave orders.  If the chief's orders were not obeyed, a violation would occur, meaning that the offender could get beaten up.  On April 23, 1999, defendant and several other members of the gang were drinking alcohol at Jajou's house in the Michael Todd Apartments.  He left with codefendants Negrete and Holman and went to Negrete's uncle's house in the Boxwood apartments.  They were in Holman's red truck, Negrete was in the passenger seat, and defendant was in the bed of the truck.  After finding that Negrete's uncle was not at home, they headed back to Jajou's house.  They turned onto Euclid Avenue, where they saw Mashod's white Lincoln.  They pulled alongside of the Lincoln, and he, defendant, exchanged gang signs with Mashod.  Mashod then turned into a nearby gas station, and Holman turned the truck around.  Defendant heard a gunshot and ducked down before hearing two more gunshots.  Defendant was unsure where the shots came from but thought that they came from the cab of the truck.  Holman then drove back to Jajou's house.  The next afternoon, defendant was taken to the Mount Prospect police station and placed in an interview room with Detective Belmonte and ASA Kinnerk.  When defendant denied involvement in the shooting, Detective Belmonte told him that his friends ratted on him.  Defendant then asked what the shooter would get, and ASA Kinnerk brought out her statute book and said that since this was a drive-by shooting, the shooter would be charged with first degree murder.  ASA Kinnerk then told him that she could try and get manslaughter for him, depending upon what he said.  Detective Belmonte left the room and returned with Jajou.  Jajou sat down next to defendant and told him in Assyrian to take the rap.  After saying that, Jajou said, in English, "Do the right thing, bro.  This has got to stop."  Defendant testified that he thought he had been given an order by his gang's chief to cooperate with the police and the ASA.  After Detective Belmonte escorted Jajou from the room, defendant began crying and ASA Kinnerk asked him if he needed a napkin and some water.  She then asked him whether he wished to speak to her alone, and he said that he would.  ASA Kinnerk then told defendant the facts that she already knew.  Defendant thought she was going to help him because she seemed nice.  ASA Kinnerk never asked defendant whether he wanted a court-reported statement but started to write the statement out herself based on what she already knew.  At this point in his testimony, defendant fainted, and court was adjourned until the next morning.  When the trial resumed, defendant testified that ASA Kinnerk talked with him and took notes.  She then left the room and returned with the statement fully written out, which they reviewed and he signed.  He signed the statement because he had a direct order from his chief, and he was scared that if he did not follow it, he would suffer consequences.  He thought ASA Kinnerk was helping him because she wrote in the statement that defendant assumed the victim had a gun but that he never actually saw a gun in the victim's hands.  

After closing arguments, the jury found defendant guilty of first degree murder and aggravated discharge of a firearm.  Defendant's motion for a new trial was denied.

Defendant has raised four issues on appeal.  He first contends that the trial court erred in denying his motion to suppress his statement because he was in a vulnerable mental state at the time the statement was given and was led to believe that he would only be charged with manslaughter if he confessed.  Alternatively, defendant contends that the trial court denied him a fair hearing on his motion to suppress because the court did not allow defense counsel to elicit relevant evidence from the witnesses or make an offer of proof regarding the circumstances that would have supported his allegation that his confession was involuntary.  Defendant next contends that because a juror was excused for fear of gang intimidation and mentioned that other jurors had expressed similar concerns, the trial court erred by not making further inquiry or investigation.  Defendant also contends that the portion of the reenacted truth-in-sentencing law that bars good-time credit for first degree murder defendants is unconstitutional because it defeats the constitutional requirement that all penalties shall be determined both according to "the seriousness of the offense and with the objective of restoring the offender to useful citizenship," and because it classifies all persons convicted of first degree murder as similarly situated with respect to their qualifications for good-time credit.  Finally, defendant contends that the trial court's reliance on improper sentencing factors denied him a fair sentencing hearing and requires that his sentence be reduced or that the cause be remanded for a new sentencing hearing. 

Defendant first contends that the trial court erred in denying his motion to suppress his statement because he was in a vulnerable mental state at the time the statement was given and  was led to believe that he would only be charged with manslaughter if he confessed.  He argues that Detective Belmonte admitted at the pretrial hearing that ASA Kinnerk made such a promise. 

In determining whether a confession was voluntary, we must consider the totality of the circumstances.  
People v. Arroyo
, 328 Ill. App. 3d 277, 286 (2002).  Factors to consider include the defendant's age, intelligence, background, experience, mental capacity, education, and physical condition at the time of the questioning; the legality and duration of the questioning; and any physical or mental abuse by police, including the existence of threats or promises.  
People v. Morales
, 329 Ill. App. 3d 97, 111 (2002).  No single factor is dispositive.  
Morales
, 329 Ill. App. 3d at 111.  The test of voluntariness is "whether the
 defendant made the statement freely, voluntarily, and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he or she confessed."  
People v. Gilliam
, 172 Ill. 2d 484, 500 (1996).  

When reviewing whether defendant's statement was voluntary, we accord great deference to the trial court's factual findings, and we will reverse those findings only if they are against the manifest weight of the evidence.  
Arroyo
, 328 Ill. App. 3d at 287.  However, we apply the 
de novo
 standard of review when analyzing the ultimate question of whether defendant's confession was voluntary.  
Morales
, 329 Ill. App. 3d at 111.

Here, the trial court specifically found that defendant's statement was not the product of psychological or any other type of coercion and that his will was not overborne in any way.  The trial court also found that there were no promises made to defendant regarding involuntary manslaughter.  When presented with a motion to suppress, the trial court must resolve conflicts in the evidence and determine the credibility of witnesses.  
People v. Redd
, 135 Ill. 2d 252, 289 (1990).  Here, the trial court was in a better position to assess the credibility and demeanor of the witnesses who testified at the hearing and assess the relevant facts.  The trial court resolved all conflicts in the evidence against defendant.  After reviewing the testimony at the suppression hearing, we conclude that the trial court's finding that defendant's confession was voluntary was not against the manifest weight of the evidence.

Alternatively, defendant contends that the trial court prevented him from developing additional grounds to support his argument that his statement was involuntary.  Specifically, defendant argues that the court prevented him from showing that his two codefendants named him as the shooter and that his cousin, the gang chief, ordered him to confess.  However, the record contradicts defendant's assertions.  Detective Belmonte testified that after his interview with codefendant Holman, he began looking for defendant and codefendant Negrete.  Detective Belmonte and ASA Kinnerk also testified that both codefendants implicated defendant as the shooter.  Furthermore, defendant testified that it was his impression and belief that his cousin had ordered him to confess.  Thus, we find defendant's argument to lack merit.  

Defendant next contends that because a juror was excused due to his fear of gang intimidation and had "mentioned" that other jurors had expressed similar concerns, the trial court erred in 
sua sponte
 barring that juror from stating that other jurors had expressed similar fears and who those jurors were and their comments.

On the second day of defendant's trial testimony, one of the jurors, Mr. DeGioia,  approached one of the assistant State's Attorneys and asked if he could speak to her.  She did not allow the juror to speak with her.  The juror then contacted Deputy Sheriff Samuels and stated that he had something important to talk to the judge about.  The trial court then questioned Mr. DeGioia outside the presence of the jury.  Mr. DeGioia stated that he was fearful because members of defendant's family and various gang members present in the courtroom were following the jurors to their cars. He was afraid that he had been followed home and feared for his safety and that of his family.  The following colloquy then took place:

"THE COURT:  Let me ask you this: Have you spoken to any other jurors about this?

MR. DEGIOIA: No.

THE COURT: Not one word?

MR. DEGIOIA: Not - - I mean people have said something, not just me.

THE COURT: I'm asking have you spoken to any jurors about what you just told us now?

MR. DEGIOIA: I haven't - - I haven't said anything that I'm afraid or nothing.  I just - - We have talked and the people have said, boy, you know, this is kind of weird and - - 

THE COURT: I'm not asking you what all your conversations were.

MR. DEGIOIA: Yes, I have.

THE COURT: I don't want you to tell me that.  Wait for my question.

MR. DEGIOIA: We have - - 

THE COURT:  Wait for my question.  My question to you is this: Did you talk to any other jurors about what you have just said to this Court now, yes or no?

MR. DEGIOIA: No, not - -

THE COURT: Okay.  That's all I need.  Mr. Sheppard, do you have any questions?

MR. SHEPPARD: Your Honor, may I inquire?  One that concerns me is what Mr. DeGioia said with reference to the other jurors at this point.

THE COURT: Well, I'm a little hesitant because I don't want to get into any matters that are not proper for us to hear.  So if you keep them specifically to what he said here and his ability to be fair to other jurors, yes; but I don't want you to delve into any conversations, not that there were any conversations about evidence, but I don't want to delve into that.  

MR. SHEPPARD: I won't address evidence, just in terms of the general fear that Mr. DeGioia has.  I just want to know if he has tainted the other jurors.  I think I am duty bound to ask that question if you permit me to.

* * * 

MR. SHEPPARD: Based on any comments and conversations and things you have uttered out of your mouth to other jurors do you think you have made an impact on other jurors' ability to be composed and fair with regard to deliberating on the evidence and facts in this case?

MR. DEGIOIA: No, I don't think so. 

* * *

MR. SHEPPARD: By allowing that question to the Juror, I think I satisfied my duty to my client to insure that he didn't taint the other jurors and he answered forthrightly that he did not believe that is the case, therefore I believe we can go forward in this matter."

Based on the above colloquy, defendant argues that the trial court should have interrogated the entire jury for possible taint arising from their contact with juror DeGioia.  

As a rule, it is improper for jurors to discuss among themselves the case or any subject connected to the case until all the evidence has been presented and after receiving final instructions.  
People v. Aleman
, 313 Ill. App. 3d 51, 63 (2000).  However, it was within the sound discretion of the trial court whether to reopen 
voir dire
 of the jury.  
People v. Flowers
, 52 Ill. App. 3d 430, 436 (1977).  It is only the improper abuse of that discretion by the trial court that is error, not the refusal to interrogate the jury.  
Flowers
, 52 Ill. App. 3d at 436. 

Here, immediately after the trial court was alerted of juror DeGioia's attempts to make contact with the State's Attorney and his actual contact with Deputy Samuels, DeGioia was summoned and questioned.  Defendant's attorneys and the State's Attorneys were all present, and defense counsel was permitted to further question DeGioia concerning his contact with the other jurors.  DeGioia stated that he had not expressed his concerns to the other jurors, and defense counsel stated on the record that he was satisfied that the jury had not been tainted.  Defendant never requested that the entire jury be questioned, and the trial court's refusal not to 
sua sponte
 question the entire jury did not constitute an abuse of discretion.  See 
People v. Harris
, 123 Ill. 2d 113, 134-35 (1988);  
Aleman
, 313 Ill. App. 3d at 64; 
Flowers
, 52 Ill. App. 3d at 437.  

Defendant's third contention is that the recently reenacted truth-in-sentencing law, section 3-6-3(a)(2)(i)
 of the Unified Code of Corrections (730 ILCS 5/3-6-3(a)(2)(i) (West 2000)), which bars first degree murder defendants from receiving "good conduct credit," is unconstitutional because: (1) it defeats the Illinois constitutional requirement that "all penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship"; and (2) it unconstitutionally classifies all persons convicted of first degree murder as similarly situated with respect to their qualifications for good-conduct credit.  He argues that the law defeats prisoner rehabilitation by depriving first degree murder defendants of any incentive to rehabilitate themselves.  Defendant also contends that the law "creates an unreasonable classification by consigning all defendants convicted of first degree murder to the same bleak prospect of getting no credit for good conduct, despite the fact that there are (a) great differences in the culpability of various first degree murders, and (b) substantial differences between the potential for rehabilitation of different defendants." 

While this issue was not raised in a post-trial motion, we find it is not waived because a constitutional challenge to a statute may be made at any time.  
People v. Bryant
, 128 Ill. 2d 448, 454 (1989). 

The original truth-in-sentencing law, enacted in 1994, was held unconstitutional by the supreme court in 
People v. Reedy
, 186 Ill. 2d 1, 11 (1999), which stated that the provisions were enacted as part of a statute that violated the single-subject requirement of the Illinois Constitution (Ill. Const. 1970, art. IV, §8(d)).  The legislature responded by reenacting the provisions within an act that did not violate the single-subject rule (730 ILCS 5/3-6-3(a)(2) (West 2000)).  That act, in pertinent part, states that "a prisoner who is serving a term of imprisonment for first degree murder shall receive no good conduct credit and shall serve the entire sentence imposed by the court."  730 ILCS 5/3-6-3(a)(2)(i) (West 2000).  

In determining the constitutionality of a legislative enactment or a law passed pursuant to legislative authority, the judiciary is limited to a determination of whether the law is a valid exercise of the State's police power to promote the public comfort, health, safety, morals or welfare.  
People v.  Adams
, 116 Ill. App. 3d 315, 320 (1983).  A strong presumption of constitutional validity attaches to authorized enactments, and the party attacking a law has the burden of showing that it is unreasonable.  
Adams
, 116 Ill. App. 3d at 320.  

Defendant argues that this provision is unconstitutional essentially because it treats all first degree murder defendants the same regardless of their culpability level in the crime or their personal potential for rehabilitation.  We disagree.  

The equal protection clause of the fourteenth amendment (U.S. Const., amend. XIV) requires equality between groups of people who are similarly situated and does not require equality or proportionality of penalties for dissimilar conduct.  
People v. DeSimone
, 108 Ill. App. 3d 1015, 1027 (1982), citing 
People v. Bradley
, 79 Ill. 2d 410, 416 (1980).  Only " '[w]hen the law lays an unequal hand on those who have committed intrinsically the same quality of offense and [penalizes] one and not the other' " is the equal protection clause violated.  
Adams
, 116 Ill. App. 3d at 321, quoting 
Skinner v. Oklahoma
, 316 U.S. 535, 541, 86 L. Ed. 1655, 1660, 62 S. Ct. 1110, 1113 (1942).  

The legislature, under the State's police power, has wide discretion to fix penalties for defined offenses subject to the constitutional requirement that a person's liberty cannot be deprived without due process of law.  See 
Bryant
, 128 Ill. 2d at 456;  
People v. Steppan
, 105 Ill. 2d 310, 319 (1985); 
DeSimone
, 108 Ill. App. 3d at 1027.  The standard measure of the proper exercise of police power is whether the statute is reasonably designed to remedy evils that the legislature has determined to be a threat to the public health, safety, and general welfare.  
Bradley
, 79 Ill. 2d at 417.  

Here, the truth-in-sentencing law requires that first degree murder defendants serve all of their sentence and that they are not eligible for good-conduct credit.  The law, therefore, treats all first degree murder defendants exactly the same and does not distinguish among the different ways that first degree murder can be committed as defendant is suggesting it should.  First degree murder is the most serious offense that can be committed, and it is therefore reasonable that the penalty for it also be severe.  We can discern no unequal treatment here and no violation of the equal protection clause of either the federal or state constitution.  Nor is there a due process violation; this law is reasonably designed to remedy the evil of murderers not serving their complete sentences, and the imposition of the truth-in-sentencing guidelines for such conduct is constitutionally permissible.  

Finally, defendant contends that the trial court erred in considering improper factors in mitigation at his sentencing hearing.  He argues that the trial court improperly considered his education, employment history, and the fact that he was on probation at the time the instant offense was committed.  Defendant also argues that the trial court improperly noted that he pled guilty to a lesser offense than he was originally charged with in a previous matter.  

These arguments were not raised in defendant's post-trial motion and are, therefore, waived.  
People v. Enoch
, 122 Ill. 2d 176, 185-86 (1988).  Furthermore, plain error does not apply because this error did not deprive defendant of a fair and impartial trial, nor was the evidence closely balanced.  
People v. Laugharn
, 297 Ill. App. 3d 807, 810-11 (1998).  Waiver notwithstanding, defendant's contention is without merit.

Defendant was sentenced to a  40-year prison term for first degree murder, which carries a sentencing range of 20 to 60 years.  730 ILCS 5/5-8-1(a)(1)(a) (West 2000).  The trial court noted defendant's employment history and his education, as well as the fact that he was on probation at the time of the offense.  The trial court also noted in passing that defendant pleaded guilty to a lesser offense than what he was originally charged with in a prior case.  While the legislature has identified certain statutory factors to be considered in imposing sentence (
People v. Heineman
, 260 Ill. App. 3d 476, 480 (1994)), such as whether a defendant is currently on probation for a prior felony (730 ILCS 5/5-5-3.2(a)(12) (West 2000)), or that a defendant has led a law-abiding life for a substantial period of time before the commission of the present offense (730 ILCS 5/5-5-3.1(a)(7) (West 2000)), the trial court is not precluded from considering nonstatutory factors (
People v. Irby
, 237 Ill. App. 3d 38, 70 (1992)).  Furthermore, a trial court's sentencing decision is entitled to great deference and will not be disturbed absent a showing of an abuse of discretion.  
People v. Thurmond
, 317 Ill. App. 3d 1133, 1142 (2000).  A trial judge's inclusion of some personal observations does not necessarily rise to an abuse of discretion.  
Thurmond
, 317 Ill. App. 3d at 1142.  Any additional comments or observations made by the trial judge are generally of no consequence where the record shows that the court otherwise considered proper sentencing factors.  
Thurmond
, 317 Ill. App. 3d at 1142.  

After carefully reviewing the record of the sentencing hearing, we conclude that the trial court properly considered appropriate factors in mitigation and aggravation and that defendant's sentence was not an abuse of discretion.  

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

HOFFMAN and WOLFSON, JJ., concur.

FOOTNOTES
1:
Codefendant Negrete's conviction and sentence were affirmed by this court on direct appeal in an unpublished order on November 13, 2002.  
People v. Negrete
, No. 01-1643 (2002), 
modified on denial of petition for rehearing 
(unpublished order under Supreme Court Rule 23).